UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
ROBERT INGRAM,                              :

                          Petitioner,       :

              -against-                     :          **REPORT AND RECOMMENDATION**

UNITED STATES OF AMERICA,                   :          07-CR-961-LBS-5
                                                       13-CV-6613 (PGG) (KNF)
                          Respondent.       :
------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE PAUL G. GARDEPHE, UNITED STATES DISTRICT JUDGE

## INTRODUCTION

Before the Court is Robert Ingram's ("Ingram") motion, made <u>pro se</u>, pursuant to

28 U.S.C. § 2255, to vacate his sentence of 144 months imprisonment, three years supervised

release and mandatory $100 special assessment, following his conviction for conspiracy to

commit wire fraud, in violation of 18 U.S.C. § 1349.  Ingram contends that: (1) "he was

sentenced under a version of the U.S. Sentencing Guidelines Manual ["the Guidelines"] that was

promulgated after he committed his crime which increased the applicable range of incarceration

in violation of the Ex Post Facto Clause," and his trial and appellate counsel rendered ineffective

assistance to him when they failed to object to this error; (2) "his sentence was predicated on the

basis of inaccurate information in violation of the Fifth Amendment Due Process Clause of the

Constitution," and his counsel rendered ineffective assistance to him when counsel advised him

"that in economic crimes there is no real difference between six million and seven million

[dollars in loss] in terms of the length of a sentence"; (3) he is actually innocent "of the charged

offense as a matter of law in violation of the due process clause of the Fifth Amendment,"

because his "conviction of wire fraud requires proof beyond a reasonable doubt of an electronic communication or wire transmission," and he "allocuted at his plea hearing that the funds were sent from the investor's bank to his bank," which "is not a wire or electronic communication necessary to establish proof beyond reasonable doubt to convict"; and (4) "there are clerical errors in the Judgement and Commitment Order dated October 04, 2010," namely, "the fine is stated as 7 milliom - 7 million.  The Guidelines calculation is stated as 7 months below 121 months," but "there is no statement of the amount of the Judgment in the amount of $6,791,512.00, as given in the Government['s] letter dated July 7, 2011."  The respondent opposed the petition.  Subsequently, Ingram withdrew his claims of ineffective assistance of counsel and asked for a review of "his claim of actual innocence of the charged offense as a matter of law in violation of the Due Process Clause of the Fifth Amendment," as "expressed under Ground Three of his 2255 Motion served and filed on September 17, 2013, and supported by his Reply Memorandum served and filed on March 18, 2014."  <u>See</u> Docket Entry No. 21.

## BACKGROUND

Ingram purported to be the director of an investment program involving highly profitable notes issued overseas and backed by the Federal Reserve.  He explained to his victims that he had a relationship with a former Central Intelligence Agency operative, Chong Shing Wu ("Wu"), who had access to sophisticated and high-yield investment vehicles located abroad. Ingram and his conspirators told their victims that if the victims invested funds to cover certain fees incurred by one such investment vehicle, they would quickly obtain high-yield returns. Conspirators Noemi Dodakian ("Dodakian") and Olivia Jeanne Bowen ("Bowen") worked as "facilitators" for Ingram's scheme and for another scheme operated by David Norman

2

("Norman"), recruiting victim investors.  After making initial investments, victims were induced

to make additional investments based on either promises of even greater returns or threats that no

returns would be realized until certain unexpected fees were paid.  Victims were also encouraged

to recruit additional investors in the scheme, with promises that they would receive commissions

on these investments.  Ultimately, the victims did not receive the promised returns, because

Ingram and other perpetrators of the fraud took the money for themselves.  As demonstrated by

the bank records produced during discovery, Ingram received, personally, over seven million

dollars in victim money through multiple bank accounts that he or his family members

controlled.  Ingram paid over $400,000 of these funds to Wu, transferred a portion of the money

overseas, and used the rest to pay for personal expenses.  The investor funds were neither used to

pay fees to secure the release of funds from any investment vehicle nor otherwise invested.

Ingram and his conspirators defrauded over 50 victims, including a victim he solicited at a

medical treatment facility, as she endured debilitating chemotherapy for end-stage breast cancer.

Ingram continued to lie to her and other victims even after his arrest in this case.

A superseding indictment was filed, on July 31, 2008, charging: (1) Norman, Dodakian

and Bowen with conspiracy to commit wire fraud; (2) Ingram, Wu, Dodakian and Bowen with

conspiracy to commit wire fraud, both in violation of 18 U.S.C. § 1349.  On April 8, 2010,

Ingram pleaded guilty to count two of the superseding indictment, without entering into a plea

agreement.  Prior to Ingram's guilty plea proceeding, the prosecution had provided Ingram with

a letter, pursuant to United States v. Pimentel, 932 F.2d 1029 (2d Cir. 1991), setting forth its

position regarding the application of the Guidelines to his offense.

Before Ingram's sentencing, the parties identified certain contested factual issues relevant

to sentencing, namely, whether Ingram should receive: (i) a 2-level sentence enhancement,

pursuant to Section 3A.1.1(b)(1) of the Guidelines, for knowing that at least one victim of his fraud was vulnerable; (ii) a 4-level leadership sentence enhancement, pursuant to Section 3B1.1 of the Guidelines; and (iii) a 2-level sentence enhancement, pursuant to Section 2B1.1(b)(1) of the Guidelines, for commission of a "substantial part" of the scheme from outside the United States.  One of the exhibits provided to Ingram by the prosecution was a summary chart, GX 2016, prepared by a forensic accountant for the government, based upon records of bank accounts that Ingram owned or controlled through family members, as revealed during the investigation.  The chart showed that, during the course of the conspiracy, Ingram received, personally, over $7.9 million dollars directly from victims and conspirators.  The chart did not show additional millions of dollars received by Ingram's conspirators during the course of the conspiracy, as reflected in other discovery previously provided to Ingram.  The Presentence Investigation Report, prepared for the court by the Probation Department, indicated that the amount of loss exceeded $7 million dollars.

On September 28, 2010, a hearing was held, pursuant to United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979), to resolve the factual disputes.  Ingram's counsel stated that he had reviewed the Presentence Investigation Report with Ingram and that Ingram's objections related to the three factual issues to be resolved at the hearing.  The court agreed with the Probation Department that Ingram's offense level was 34, criminal history category was I, and that the corresponding Guidelines range was 151 to 188 months imprisonment.  The court imposed a below-the Guidelines sentence of 144 months imprisonment, followed by three years of supervised release, and a mandatory $100 special assessment.

Ingram appealed, arguing that: (1) "his sentence was both procedurally and substantively unreasonable" because the court "committed procedural error by relying upon improper grounds

4

in imposing the 'vulnerable victim' enhancement under subsection 3A1.1(b)(1)" of the Guidelines; (2) "his sentence was substantively unreasonable because the court failed to consider each of Ingram's three arguments for a below-Guidelines sentence"; and (3) "trial counsel rendered ineffective assistance by failing to move for dismissal under <u>Younger v. Harris</u>, 401 U.S. 37, 91 S. Ct. 746, 27 L.Ed. 2d 669 (1971)." <u>United States v. Ingram</u>, 490 Fed. Appx. 363, 364-65 (2d Cir. 2012). The Second Circuit affirmed the judgment, rejecting Ingram's arguments. The instant motion followed.

***Ingram's Contentions***

Ingram contends that he was sentenced under the 2009 Guidelines, which provided for greater punishment than the 2005 Guidelines in effect when he committed his crime. He asserts that his offense occurred during early 2005 to August 2008. According to Ingram, at the time he committed his crime, "the recommended sentence was 135-168 months, the Court's sentence was 129 months - - seven months below the bottom of the [G]uidelines range. When Petitioner was sentenced it was 151-168 months, the Court's sentence was 144 months - - seven months below the bottom of the guidelines range." Ingram contends that "a retrospective increase in the measure of punishment . . . raised ex post facto concerns."

Ingram asserts that, during his plea allocution, he stated that he obtained "five million" dollars from investors. Moreover, he was sentenced to pay restitution in the amount of $6,791,512.00. He maintains that "the basis of his sentence should be a loss amount more than five million but less than seven million." According to Ingram, had his sentence been based on his plea allocution of "five million" dollars loss, the sentence would have been 114 months imprisonment, which is "30 months less than the sentence imposed using inaccurate loss information."

Ingram contends that he is actually innocent because he was convicted without "proof beyond a reasonable doubt of an electronic communication or wire transmission." According to Ingram, he "allocuted at his plea hearing that the funds were sent from the investor's bank to his bank." He asserts that the bank wire transaction is not a wire or electronic communication "under the definitive statutory language." In support of his argument, Ingram invokes a definition of "electronic communication," pursuant to 18 U.S.C. Sections 2510-2522, which excludes "electronic funds transfer." He contends that an electronic fund transfer is a bank credit issued under a bank payment order instruction, and it "is explicitly excluded from the statutory definition of electronic communication as applied." Ingram maintains that, since the wire transmission does not include an electronic fund transfer, no wire or electronic communication occurred. Ingram contends that "[t]he exclusive and comprehensive body of law governing electronic funds transfers is Article 4-A, et seq., incorporated with Regulation J," and the Article 4-A of the Uniform Commercial Code should apply in his case.

***Respondent's Contentions***

The respondent contends that no basis exists to argue that Ingram should have been sentenced under the 2005 Guidelines rather than 2009 Guidelines under which he was sentenced. According to the respondent, Ingram did not identify an actual or potential ex post facto violation in connection with his sentencing under the 2009 Guidelines, which were in effect when he was sentenced. The respondent asserts that the Guidelines provisions used to calculate Ingram's offense conduct and criminal history are identical in the 2005 Guidelines and the 2009 Guidelines, including Ingram's offense level calculated under both the 2005 Guidelines and the 2009 Guidelines as follows:

Pursuant to U.S.S.G. § 2B1.1, the base offense level is 7;

Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), because the reasonably foreseeable loss was more than $7 million but less than $20 million, the offense level is increased by 20 levels;

Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), because the offense involved more than 50 victims but not more than 250, the offense level is increased by 4 levels;

Pursuant to U.S.S.G. § 3B1.1, because the defendant was an organizer or leader of criminal activity that involved 5 or more participants or was otherwise extensive, the offense level is increased by 4 levels;

Pursuant to [U.S.S.G.] § 3A.1.1(b)(1), because the defendant knew or should have known that a victim of the offense was a vulnerable victim, the offense level is increased by 2 levels; and

Pursuant to U.S.S.G. § 3E1.1, the defendant is entitled to a 3-level decrease in his offense level for acceptance of responsibility.

The respondent contends that, since no difference exists between Ingram's applicable Guidelines range under the 2005 Guidelines and the 2009 Guidelines, "there can be no question that the Probation Department and Judge Sand correctly used the 2009 Guidelines at Ingram's sentencing."

The respondent asserts that Ingram's contention, that he should have been responsible for less than $7 million dollars loss because, "when asked by Judge Sand during his plea how much money he received from victims in the course of his fraud, Ingram responded, '[i]n my best estimation, it was about $5 million,'" is baseless. The respondent maintains that Ingram's own bank records, produced during discovery, showed over $7 million dollars received by him, personally, during the course of the scheme, and the bank accounts of his conspirators showed millions of additional dollars were received from victims, which are all facts that Ingram does not dispute. Moreover, Ingram made no allegation, on appeal, that he was held responsible, improperly, for $7 million dollars in losses. The respondent contends that the amount of restitution Ingram was ordered to pay is calculated more narrowly than loss under the

Guidelines, since the restitution, in fraud cases, may be paid only to identifiable victims and does not include intended loss.

The respondent contends that the wire transfers from victims' bank accounts into his bank account are sufficient to support a wire fraud conviction, and Ingram allocuted to those wire transfers. The respondent maintains that the statutes Ingram invoked in support of his argument, 18 U.S.C. § 2510-2522, are inapposite because they authorize the interception of wire communication in wiretaps and provide that electronic communications for purposes of those statutes do not include electronic fund transfers.

The respondent asserts that Ingram did not suffer any prejudice from the alleged clerical error in his judgment. Although the judgment does not reflect the amount of restitution, the court ordered the restitution in an amount to be determined within 90 days of sentencing, and the prosecution submitted, timely, a proposed restitution order in the amount of $6,791.512. "While the judgment was not apparently subsequently amended to reflect the restitution amount imposed by Judge Sand's order, there is no question that restitution was properly and timely imposed, and Ingram identifies no violation of his Constitutional rights" or any prejudice resulting from the error. The respondent contends that no need exists for an evidentiary hearing because Ingram offers only unsupported and conclusory allegations that are contradicted by the record and the law.

### *Ingram's Reply*

Ingram asserts that he stated during his pleading proceeding "that the investors' bank wired funds from their bank account to his bank account," and it appears, based on his statement, "that the investors' [sic] were deprived of 'money or property' via Petitioner's misrepresentations concerning a business transaction in which he misused interstate bank wires

8

in its' [sic] furtherance to obtain their funds." Ingram contends that the prosecution did not

provide any evidence "that would overcome the presumption that [the investors'] moneys on

deposit were intended to be other than a general deposit." He asserts that the government "has

only shown that the investors['] bank wired funds from their accounts to Petitioner['s] accounts

and nothing more." According to Ingram, "[m]oney deposited in a general account at a bank

does not remain the property of the depositor." Thus, his "claim is predicated on the fact that the

investors never had 'title to' or 'possession of' or 'ownership of' any existing property rights as

required under Section 1343 to establish a conviction beyond a reasonable doubt."

## DISCUSSION

### *Legal Standard*

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was imposed in
> violation of the Constitution or laws of the United States, or that the court was
> without jurisdiction to impose such sentence, or that the sentence was in excess of
> the maximum authorized by law, or is otherwise subject to collateral attack, may
> move the court which imposed the sentence to vacate, set aside or correct the
> sentence.

28 U.S.C. § 2255(a).

"Unless the motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief, the court shall cause notice thereof to be served upon the United States

attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and

conclusions of law with respect thereto." 28 U.S.C. § 2255(b). "A hearing is not required . . .

where the allegations are insufficient in law, undisputed, immaterial, vague, conclusory,

palpably false or patently frivolous." United States v. Malcolm, 432 F.2d 809, 812 (2d Cir.

1970).

9

The Due Process clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The first question in any due process inquiry is whether the plaintiff has a constitutionally protected interest. In a criminal proceeding, the existence of a constitutionally protected liberty interest is obvious." DeMichele v. Greenburgh Cent. Sch. Dist., 167 F.3d 784, 789 (2d Cir. 1999) (citation omitted). The second question is whether the government deprived the petitioner of his due process rights. See id.

> Generally, sentencing courts are required to apply the Guidelines Manual in effect on the date that the defendant is sentenced. If, however, "the court determines that the use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." Once the appropriate edition of the Guidelines has been selected, the sentencing court is generally required to apply that edition in its entirety. As an exception to the above rule, however, "if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes."

> United States v. Brooks, 732 F.3d 148, 149 (2d Cir. 2013) (citations omitted).

"No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. "To fall within the *ex post facto* prohibition, a law must be retrospective-that is, 'it must apply to events occurring before its enactment'- and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment for the crime." Lynce v. Mathis, 519 U.S. 433, 441, 117 S. Ct. 891, 896 (1997) (citations omitted). "[W]here application of the Guidelines in effect at sentencing would result in a more severe sentence than the version in effect at the time of the commission of the offense, the *Ex Post Facto* Clause of Article I of the Constitution requires use of the earlier version of the Guidelines." United States v.

Broderson, 67 F.3d 452, 456 (2d Cir. 1995).[1]

***Application of Legal Standard***

> Whether an Evidentiary Hearing Is Warranted

Upon review of the entire record in the underlying criminal case and the instant motion, the Court finds that an evidentiary hearing is not warranted, because the petitioner's allegations are insufficient in law and conclusory.

> Ex Post Facto Clause Violation Claim

Ingram failed to identify any ex post facto clause violation related to the use of the 2009 Guidelines in effect at the time of his sentencing rather than "the 2005 Guidelines Manual in effect when he committed his crime." The Guidelines in effect: (a) as of November 1, 2004; (b) as of November 1, 2005; and (c) as of November 1, 2009, are identical with respect to the base level offense, victim-related adjustment, role in the offense and acceptance of responsibility, resulting in the same total offense level of 34. They are also identical with respect to Ingram's criminal history category I, as well as the sentencing range of 151-188 months imprisonment for Ingram's offense level of 34 and criminal history category I. Since no difference between the 2009 Guidelines and those in effect during the calendar year 2005,

---

[1] After the instant motion was filed, the Supreme Court held that an ex post facto violation exists "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." Peugh v. United States, __ U.S. __, 133 S. Ct. 2072, 2078 (2013). Subsequently, the Second Circuit, in denying permission to file a successive 28 U.S.C. § 2255 motion based on the holding in Peugh, held "that the rule announced in *Peugh* does not constitute 'a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court.'" Herrera-Gomez v. United States, 755 F.3d 142, 147 (2d Cir. 2014). However, the Court notes that the Supreme Court's holding in Peugh, concerning an ex post violation related to the use of the Guidelines, does not differ in substance from the rule in this circuit, as articulated in Broderson.

namely the Guidelines in effect as of November 1, 2004, and the Guidelines in effect as of

November 1, 2005, exists as they related to Ingram's sentence, no basis exists to support

Ingram's ex post facto clause violation claim.  Accordingly, Ingram cannot obtain relief based

on his ex post facto clause violation claim.

<u>Sentence Predicated On Inaccurate Loss Amount Information Claim</u>

Ingram's contention that he should have been sentenced based on his "unobjected to

allocution of five million," rather than seven million dollars in loss, is meritless.  During his plea

allocution, the court asked Ingram how much money he received from victims in the course of

his fraud, to which he responded: "In my best estimation, it was about $5 million."  The record

shows that Ingram did not state during his plea allocution, as he claims in the instant motion, that

the amount he obtained from the victims was "five million"; rather, he stated: "In my best

estimation, it was about $5 million."  However, Ingram's own bank records showed over $7

million dollars were received by Ingram, personally, from the victims during the course of the

scheme, and the bank records of his conspirators showed additional millions were received from

the victims, which Ingram does not dispute.  Moreover, Ingram's counsel stated that he had

reviewed the Presentence Investigation Report with Ingram, adopted by the court, which

indicated that Ingram received approximately $7 million dollars from his victims and his

conspirators received additional millions of dollars from the victims.  No objection to the

Presentence Investigation Report was made by Ingram, and his counsel stated, repeatedly, during

the <u>Fatico</u> hearing that Ingram was responsible for a loss to the victims in excess of $7 million

dollars.  Notwithstanding Ingram's estimation, during his plea allocution, that he personally

received "about $5 million" dollars from his victims, the evidence supports the finding of $7

million dollars in losses.  Ingram's statement, during his plea allocution, that, in his estimation,

12

he received, personally, "about $5 million," in light of the evidence that the loss to the victims was over $7 million dollars, is not sufficient to establish that the amount of loss upon which he was sentenced was inaccurate. Accordingly, Ingram failed to demonstrate that his sentence was predicated on inaccurate loss amount information, and he cannot obtain relief based on that claim.

Actual Innocence Claim

Ingram contends that he is actually innocent because the wire transactions at issue, by which the funds were sent from the victims' banks to his bank, represent "electronic funds transfers," not included in the definition of an electronic communication or wire, pursuant to 18 U.S.C. § 2510(12)(D), which, according to Ingram, governs the offense underlying his conspiracy conviction, namely, wire fraud, 18 U.S. C. § 1343. Ingram does not make citation to any binding authority in support of this contention. Moreover, in his reply, Ingram raises new arguments, inappropriately. See Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."). Wire transfers from the victims' bank accounts to the defendant's bank accounts form a proper basis for a wire fraud conspiracy conviction. Cf. United States v. Vilar, 729 F.3d 62, 94-95 (2d Cir. 2013) (upholding a wire fraud conviction based on wire transfers from the corporate account to the defendant's account). Thus, Ingram failed to show that he is entitled to relief on his actual innocence claim.

Clerical Errors In the Judgment

In connection with his clerical errors in the judgment claim, Ingram did not allege any violation of the Constitution or laws of the United States that would be cognizable on a motion such as this, or shown that such errors are otherwise subject to collateral attack. Moreover, he failed to show any prejudice resulting from the alleged clerical errors in the

13

judgment.  Absent showing a violation of federal law or that the clerical errors are otherwise subject to collateral attack, Ingram is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, I recommend that Ingram's motion, pursuant to 28 U.S.C. § 2255, be denied.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe, 40 Centre Street, Room 2204, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Gardephe.

***Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.***  See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
       December 23, 2014

Copy mailed to:

Robert Ingram

Respectfully submitted,

Kevin Nathaniel Fox

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

14